Filed 6/25/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Petitioner, v. PUBLIC EMPLOYMENT RELATIONS BOARD, Respondent; UNIVERSITY PROFESSIONAL AND TECHNICAL EMPLOYEES, CWA LOCAL 9119, Real Party in Interest. | A157597 (PERB Dec. No. 2646-H) |

University Professional and Technical Employees, CWA Local 9119 (UPTE) filed a petition for unit modification with the Public Employment Relations Board (PERB) to add a newly created classification, systems administrators I, II, and III, into a preexisting bargaining unit. PERB granted the petition, and the Regents of the University of California (University) refused to bargain over the terms and conditions of employment for systems administrators. UPTE then filed an unfair practice charge against the University, which also was granted by PERB.

The University subsequently filed a petition for writ of extraordinary relief. In its petition, the University argued the systems administrator classification did not share a community of interest with the existing

bargaining unit as required under the Higher Education Employer-Employee Relations Act (HEERA; Gov. Code,[1] § 3560 et seq.).  The University further asserted PERB erred in not requiring proof of majority support by the unrepresented systems administrators subject to the unit modification petition.  We disagree and deny the petition.[2]

## I.  BACKGROUND

### A.  *The Bargaining Unit and the "Career Tracks" Reclassification*

The University has various bargaining units for its employees. Relevant here, the "System-wide Technical Unit" (TX unit) includes nonsupervisory employees who provide technical support services for academic and scientific research throughout the University system.  PERB described the TX unit as follows:  "The University's technical employees are nonprofessional employees whose work involves the use of independent judgment and the exercise of specialized skills, often gained through advanced education or training.  Technical employees are very often licensed, certified, or registered as a requirement of employment."  UPTE serves as the exclusive representative for this unit.

In 2009, the University began an initiative to review and revise job classifications for its unrepresented employees.  This initiative was referred to as "Career Tracks."  The purpose of Career Tracks was to establish system-wide job classifications that more accurately reflected the work performed at all locations in the University system.  The initiative classified jobs into one of three categories: "Operational and Technical," "Professional," and

---

[1] All statutory references are to the Government Code unless otherwise specified.

[2] On December 12, 2019, PERB filed an unopposed request for judicial notice of six former PERB regulations published in the California Regulatory Code Supplement.  We grant the request.  (Evid. Code, § 452, subd. (b).)

2

"Supervisory & Management." The professional category, which included the systems administrator classifications, was described as including " 'positions which require a theoretical and conceptual knowledge of the specialization. Problems are typically solved through analysis and strategic thinking. At more senior levels, incumbents may independently manage or administer professional or independent programs, policies and resources.' " The operational and technical category " 'includes support, operational, technical, skilled or semi-skilled positions, where the skills are typically acquired through vocational education and/or apprenticeships, certifications, specialized, or on-the-job training. Problems are typically solved through knowledge of past practices and procedural guidelines, or knowledge gained through a certification or licensing program.' "

The Career Tracks reclassification process created the new systems administrator classification primarily from employees then employed as programmer analysts. The preexisting programmer analyst classification was "very broad," and Career Tracks divided that classification into 22 different job functions. One of those 22 job functions is the systems and infrastructure administration job function, of which the systems administrator classification is one part.

When the petition at issue was filed, 12 University locations had implemented Career Tracks for their information technology employees, which resulted in 325 employees being reclassified as systems administrators. Five other University locations had not yet implemented Career Tracks, although one location had preliminarily mapped some employees to the systems administrator classification.

3

## B. The Unit Modification Petitions

In 2016, UPTE filed a unit modification petition to add employees in the business technical support analyst classification to the TX unit. At the time of the petition, the number of business technical support analysts was less than 10 percent of the number of employees in the TX unit.[3] PERB thus did not require UPTE to provide proof of majority support in connection with the petition, it granted UPTE's request to add the business technical support analyst classifications to the TX unit, and the University does not appear to have challenged that decision.

Shortly after PERB granted UPTE's first petition, UPTE filed a second unit modification petition (Petition). This petition sought to add employees in the systems administrator classifications to the TX unit. The Petition alleged UPTE represented approximately 3,900 employees in the TX unit, and there were approximately 290 systems administrators. Accordingly, the Petition indicated the size of the TX unit would only increase by 7.4 percent, which is below the threshold requiring proof of majority support.

The University filed a response to the Petition, arguing the systems administrator classifications are professional classifications and do not share a community of interest with the TX unit. Specifically, the University noted the TX unit consisted of "technical employees" who are nonprofessionals, whereas the systems administrator classifications are within the University's

---

[3] PERB regulations are codified at California Code of Regulations, title 8, section 31001 et seq. As discussed in greater detail in part II.E., *post*, California Code of Regulations, title 8, section 32781 (PERB Regulation 32781) requires employee organizations to provide proof of majority support of persons employed in the classifications or positions to be added to the bargaining unit if the proposed addition would increase the size of the unit by 10 percent or more. (Cal. Code Regs, tit. 8, § 32781, subd. (e)(1).)

4

"professional" category. The University argued the systems administrators "routinely perform much more sophisticated work with computers" than those employees in the TX unit, whereas TX unit employees perform work that is "routine, general, and standard."

It further asserted PERB should require UPTE to demonstrate proof of majority support by the unrepresented systems administrators subject to the unit modification petition. However, the University's response "acknowledges that granting the Petition would not increase the TX bargaining unit by more than 10 percent and, therefore, PERB regulation 32781[, subdivision] (e)(1) is not automatically triggered here." As of the date of the second petition, the University calculated there were approximately 4,059 employees in the TX unit, and it estimated 325 employees would be affected by the unit modification. The University argued, given UPTE's "recent approach" to add smaller groups under the 10 percent threshold, requiring proof of majority support would further HEERA's fundamental principle of self-determination.

UPTE filed a reply, arguing the University's classifications are irrelevant, HEERA provides a statutory definition of "professional" that excludes systems administrators, and the systems administrators share a community of interest with TX unit members. Specifically, UPTE asserted neither systems administrators nor other TX unit members are required to obtain, as a prerequisite for their positions, advanced formal education in " 'a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher learning or a hospital . . . .' " UPTE further argued PERB should not deviate from its prior decisions holding that it may not require proof of support for

unit modification petitions that seek to increase the size of a bargaining unit by less than 10 percent.

## C. *The Order to Show Cause*

The supervising regional attorney for PERB issued an order to show cause as to why the Petition should not be granted. Relying on the estimated numbers provided by the University, PERB first concluded UPTE "is not required to provide proof of support" because it seeks to add less than 10 percent of its bargaining unit. PERB also relied on its prior decision in *Regents of the University of California* (2010) PERB Dec. No. 2107-H (*2010 Regents*) to conclude "when the addition of classifications to an established unit would increase the size of the established unit by less than ten percent, PERB may not require proof of employee support." It noted, "This rule is not discretionary."

Second, PERB addressed whether systems administrators are professional employees. It concluded systems administrators do not "possess advanced knowledge usually acquired by a specialized or advanced degree, as opposed to a general academic education" and "therefore cannot be defined as professional."

Finally, PERB found a community of interest analysis was not required but, in any event, several factors demonstrate such a community. PERB explained the computer system job duties are similar between systems administrators and TX unit members, they work in the same departments, and they sometimes have common supervision.

The University filed a response to the order to show cause. The University stated it prioritized implementing the initiative in the remaining locations since the filing of the Petition, and it asserted the total number of employees "performing the work of Systems Administrators . . . at all

6

University locations exceeded 10% of the total number of employees in the TX Unit." While Career Tracks had yet to be implemented in the five remaining locations, the University estimated between 172 and 190 employees would eventually be classified as systems administrators, in addition to the 325 employees already reclassified. It noted these employees were neither new nor performing new work, but existed as of the date of the Petition. The University thus argued UPTE must provide proof of majority support.

The University also argued even if systems administrators do not meet the statutory definition of "professional," they should be recognized as professionals with a distinct community of interest from employees in the TX unit. First, the University noted an " 'administrative professionals' unit" would be more appropriate than the TX unit. It noted UPTE had recognized the professional nature of these employees and sought to represent them in such a unit, but the employees voted against such representation. Second, the University argued PERB erred by only comparing systems administrators with classifications within the TX unit rather than with other administrative professional classifications. It asserted other classifications within the "Systems and Infrastructure Administrator" function, which includes the systems administrator classification, perform "high-level analysis, design, and planning" distinct from the work performed by employees in the TX unit. Third, the University argued common supervision was the exception, rather than the rule. The University argued, based on the foregoing, PERB should hold a hearing to assess whether systems administrators share more of a community of interest with administrative professionals than with employees in the TX unit.

Finally, the University again argued *2010 Regents*, *supra*, PERB Dec. No. 2107-H was wrongly decided because PERB Regulation 32781 does not

purport to eliminate PERB's discretion to require proof of majority support when a unit modification petition adds classifications constituting less than 10 percent of the established unit. It asserted PERB should exercise such discretion to prevent UPTE from "manipulating the unit modification process to deny employee choice."

UPTE filed a reply to the University's response to the order to show cause. While generally rejecting the University's position, UPTE focused its reply on the University's argument regarding the administrative professionals unit. UPTE noted the systems administrator classification emerged from various prior titles, and those titles "were extremely numerous and diverse, performing functions far broader than the much narrower [systems administrator] work." It also clarified PERB has never recognized an "administrative professionals unit" at the University.

## D. The Administrative Determination

Following the briefing by the parties, PERB's supervising regional attorney issued an administrative determination, in which it affirmed its prior conclusions and granted the unit modification petition. The administrative determination held "the regulations require PERB to look to the date a petition is filed to decide proof of support issues." It emphasized "it is the proposed addition sought by the petition, at the time of the petition, that matters—not whether the proposed addition grows or shrinks after the time the petition is filed." PERB concluded it could not require proof of support because the number of systems administrators on the date of the petition constituted less than 10 percent of the total bargaining unit, despite this number likely increasing.

PERB again concluded systems administrators do not meet the statutory definition of "professional," and it noted there was no "Operations

8

Support Professional" or "Administrative Professionals" unit at the University to alternatively consider. PERB concluded the community of interest factors supported including systems administrators in the TX unit. In so holding, PERB found the employees "perform[ed] functionally related services and work towards common goals," had similar educational and training requirements, and worked in the same departments. PERB also explained inclusion would avoid the proliferation of units, and there was no evidence such inclusion would negatively impact the meet and confer relationship or the operations of the employer. PERB thus ordered systems administrators I, II, and III added to the TX unit.

The University subsequently appealed the administrative determination, and UPTE filed a response opposing the appeal.

### E. PERB Order No. Ad-453-H

PERB affirmed the administrative determination. As an initial matter, PERB declined to reverse *2010 Regents*, *supra*, PERB Dec. No. 2107-H. (*Regents of the University of California* (2017) PERB Order No. Ad-453-H (*2017 Regents*), p. 7.) It agreed with *2010 Regent*'s analysis and concluded *2010 Regent*'s holding did not violate HEERA's principle of employee choice because (1) employees did not have the right to choose their bargaining unit, and (2) employee choice is not absolute. (*2017 Regents*, at pp. 8–10.) PERB also declined to rely on National Labor and Relations Board (NLRB) precedents to overrule *2010 Regents* because it does not follow NLRB's approach to accretion. (*2017 Regents*, at p. 8.)

As part of its decision, PERB also concluded the administrative determination reasonably relied on UPTE's estimate as to number of affected employees. (*2017 Regents*, *supra*, PERB Order No. Ad-453-H, p. 7.) PERB noted the University was unable to "produce complete and accurate lists of

9

employees" at the time of the administrative determination.  (*Ibid.*)  Because there were no material facts in dispute, PERB concluded no evidentiary hearing was needed.  (*Id.* at p. 13.)

Next, PERB concluded systems administrators shared a community of interest with TX unit employees.  It noted "the duties of the Systems Administrator series . . . overlap significantly with those of current TX unit employees . . . and, as noted in the administrative determination, no party has identified another existing bargaining unit in which the Systems Administrator classifications would more appropriately belong."  (*2017 Regents*, *supra*, PERB Order No. Ad-453-H, p. 14.)  PERB also concluded employees in the systems administrator classification did not meet the statutory definition for " 'professional employees' " because they are not required to have an advanced degree to perform their job.  (*Id.* at pp. 14–15.)

PERB ultimately denied the University's appeal and affirmed the administrative determination granting the unit modification petition.  (*2017 Regents*, *supra*, PERB Order No. Ad-453-H, p. 26.) PERB also rejected the University's request to join in a request for judicial review of its decision.  (*Regents of the University of California* (2018) PERB Order No. JR-28-H.)

### F.  Unfair Practice Charge

In order to seek judicial review of PERB's decision, the University informed UPTE it would refuse to bargain over the terms and conditions of employment for systems administrators.  In response, UPTE filed an unfair practice charge.  The unfair practice charge contends the University violated section 3571 by refusing to bargain and refusing to recognize systems administrators as UPTE-represented employees.  The University acknowledged it was engaging in a technical refusal to bargain.

PERB concluded, in light of the University's admission it refused to recognize or bargain with UPTE as the exclusive representative of the systems administrators, that the University violated HEERA. PERB explained the University's justifications for refusing to bargain were considered and rejected in its prior decision on the Petition. It further noted the University did not proffer "any newly discovered and previously unavailable evidence" or identify any special circumstances justifying reconsideration. Accordingly, PERB ordered the University to cease and desist from refusing to bargain and take certain actions to effectuate HEERA.

The University subsequently filed its petition for writ of extraordinary relief with this court.

## II. DISCUSSION

### A. *Reviewability*

The University contends a technical refusal to bargain, which resulted in PERB sustaining an unfair practice charge against the University, is reviewable by this court under section 3564, subdivision (c) and an appropriate method for seeking review of an underlying unit determination case. In response, UPTE contends the University should not be allowed to "unilaterally overturn" PERB's decision to not seek judicial review by "willfully violat[ing]" HEERA.

Section 3564, subdivision (a) provides: "No employer or employee organization shall have the right to judicial review of a unit determination except: (1) when the board in response to a petition from an employer or employee organization, agrees that the case is one of special importance and joins in the request for such review; or (2) when the issue is raised as a defense to an unfair practice complaint." The plain language of the statute demonstrates the Legislature did not intend to limit judicial review to merely

11

those situations in which PERB agrees to join in such a request.  Rather, subdivision (a)(2) provides employers and employee organizations with a second option for obtaining judicial review—i.e., when "raised as a defense to an unfair practice complaint."  Courts have found similar language under the Agricultural Labor Relations Act to authorize such technical refusals to bargain in order to obtain judicial review.[4]  (§ 3564, subd. (a)(2).)  (See, e.g., *Gerawan Farming, Inc. v. Agricultural Labor Relations Bd.* (2018) 23 Cal.App.5th 1129, 1217–1218 (*Gerawan*).)  We see no reason to interpret section 3564 otherwise.[5]

## B.  *Standard of Review*

Our Supreme Court recently addressed the standard of review for an agency's legal determinations in *Boling v. Public Employment Relations Bd.*

---

[4] UPTE relies on *Regents of the University of California (California Nurses Association)* (1989) PERB Dec. No. 722-H, to contend a technical refusal to bargain is inappropriate for challenging unit modification petitions. But in *California Nurses Association*, the employer sought to remove a classification from a preexisting unit and then refused to bargain.  (*Id.* at p. 2.)  PERB concluded the employer was obligated to follow PERB's unit modification procedures:  "[T]he filing of a petition for unit modification is the proper mechanism by which PERB can exercise its authority to decide, in disputed cases, whether changed circumstances justify any proposed modification to an existing unit.  The applicable regulation does not, as urged by the University, contemplate the use of the technical refusal to bargain to secure PERB review of a disputed unit modification."  (*Id.* at p. 4.)  Here, however, the University did not unilaterally seek to modify a preexisting unit.  Rather, UPTE filed a unit modification petition, which PERB evaluated and, ultimately, granted.  The University now seeks review of that decision.

[5] UPTE also argues the legal issues are subject to res judicata because they were fully resolved in the underlying unit modification petition. (*2017 Regents*, *supra*, PERB Order No. Ad-453-H.) We disagree.  UPTE's reasoning as to the underlying unit modification petition would prohibit all technical refusals to bargain.  (*Gerawan*, *supra*, 23 Cal.App.5th at pp. 1217–1218 [recognizing technical refusals to bargain].)

12

(2018) 5 Cal.5th 898 (*Boling*): " 'When an agency is not exercising a discretionary rulemaking power but merely construing a controlling statute, " '[t]he appropriate mode of review . . . is one in which the judiciary, although taking ultimate responsibility for the construction of the statute, accords great weight and respect to the administrative construction. [Citation.]' [Citations.]" [Citation.] How much weight to accord an agency's construction is "situational," and greater weight may be appropriate when an agency has a " 'comparative interpretive advantage over the courts,' " as when " 'the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion.' " [Citation.] . . . Nevertheless, the proper interpretation of a statute is ultimately the court's responsibility.' " (*Id.* at p. 911.)

" '[C]ourts generally defer to PERB's construction of labor law provisions' " because "interpretation of a public employee labor relations statute ' "falls squarely within PERB's legislatively designated field of expertise," ' dealing with public agency labor relations." (*Boling*, *supra*, 5 Cal.5th at pp. 911–912.) " 'We follow PERB's interpretation unless it is clearly erroneous.' " (*Id.* at p. 912.) " ' "Even so, courts retain final authority to ' "state the true meaning of the statute." ' [Citation.] A hybrid approach to review in this narrow area maintains the court's ultimate interpretive authority while acknowledging the agency's administrative expertise." (*Ibid.*)

"[I]n reviewing PERB's findings ' "we do not reweigh the evidence. If there is a plausible basis for the Board's factual decisions, we are not concerned that contrary findings may seem to us equally reasonable, or even more so. [Citations.] We will uphold the Board's decision if it is supported by substantial evidence on the whole record." ' " (*Boling*, *supra*, 5 Cal.5th at p. 912.) Under this substantial evidence standard, "when a labor board

13

chooses between two conflicting views, a reviewing court may not substitute its judgment for that of the Board." (*California State Employees' Assn. v. Public Employment Relations Bd.* (1996) 51 Cal.App.4th 923, 933.) " ' "If there is a plausible basis for the Board's factual decisions, we are not concerned that contrary findings may seem to us equally reasonable, or even more so." ' " (*Ibid.*)

## C. *Relevant Statutory Scheme*

"In 1978, the California Legislature enacted HEERA, which extended collective bargaining rights to employees of the University of California, Hastings College of the Law and the California State University. (§ 3560, subd. (b).)" (*Regents of University of California v. Public Employment Relations Bd.* (1986) 41 Cal.3d 601, 604–605, fn. omitted.) HEERA provided, in relevant part, the right of collective bargaining to employees in the University of California system. (See *Pac. Legal Found. v. Brown* (1981) 29 Cal.3d 168, 177.) In enacting HEERA the Legislature intended to " 'provid[e] a uniform basis for recognizing the right of the employees of these systems to full freedom of association, self-organization, and designation of representatives of their own choosing for the purpose of representation in their employment relationships with their employers and to select one of these organizations as their exclusive representative for the purpose of meeting and conferring.' " (*California State Employees' Assn. v. Public Employment Relations Bd.*, *supra*, 51 Cal.App.4th at p. 929, quoting § 3560, subd. (e).)

HEERA is administered by PERB. (§ 3563.) PERB Regulation 32781 governs petitions for unit modification. Under PERB Regulation 32781, subdivision (a)(1), PERB is authorized to add unrepresented classifications or positions to an existing bargaining unit. (Cal. Code Regs., tit. 8, § 32781,

subd. (a)(1).)  Pursuant to PERB Regulation 32781, subdivision (e)(1), PERB must require proof of majority support of persons employed in the classifications or positions to be added if the proposed addition would increase the size of the established unit by 10 percent or more.  (Cal. Code Regs., tit. 8, § 32781, subd. (e)(1).)

## D.  Inclusion of Systems Administrators in the TX Unit

The University argues systems administrators should not be included in a unit of technical employees for three reasons:  (1) they fall within the definition for "professional" employees under HEERA and should be separate from "nonprofessional" employees; (2) even if they do not meet the "professional" definition under HEERA, they are administrative professionals who should not be included in the same unit as technical employees; and (3) they do not share a community of interest with other TX unit classifications.

### 1.  Section 3562

" ' "The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law.  [Citations.]" ' [Citation.]  In determining such intent, the court turns first to the words of the statute.  [Citation.]  '[W]here . . . the language is clear, there can be no room for interpretation.' " (*Regents of University of California v. Public Employment Relations Bd*., *supra*, 41 Cal.3d at p. 607.)

Section 3562, subdivision (o) defines " 'Professional employee' " as "(1) Any employee engaged in work:  (A) predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work; (B) involving the consistent exercise of discretion and judgment in its performance; (C) of a character so that the output produced or the result accomplished cannot be standardized in relation to a given period

15

of time; and (D) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher learning or a hospital, as distinguished from a general academic education or from an apprenticeship or from training in the performance of routine mental, manual, or physical processes. [¶] (2) Any employee who: (A) has completed the courses of specialized intellectual instruction and study described in subparagraph (D) of paragraph (1), and (B) is performing related work under the supervision of a professional person to qualify himself or herself to become a professional employee as defined in paragraph (1)."

At issue is whether the systems administrator classification meets the fourth requirement, i.e., requires "knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher learning or a hospital . . . ." The University contends the "professional" definition does not require a specific degree and PERB erred by not investigating the knowledge and experience possessed by employees in the systems administrator classification.

We agree with the University that an advanced degree is not a requirement for qualifying as a "professional employee" under section 3562. To hold otherwise would render the word "customarily" meaningless. (*Weaver v. Chavez* (2005) 133 Cal.App.4th 1350, 1355 [" 'We give significance to every word, avoiding an interpretation that renders any word surplusage.' "].) However, the statute's express language requires employees to have acquired such advanced knowledge, and it must be more than knowledge acquired "from a general academic education." (§ 3562, subd. (o)(1)(D).)

16

*Unit Determination for the State of California* (1979) PERB Dec. No. 110-S (*Unit Determination*), provides relevant guidance. In that matter, PERB addressed whether nonattorney hearing officers qualified as " 'professional employees' " and could be included in the same unit as attorneys. (*Id.* at pp. 17–18.) PERB acknowledged the " 'professional employee' " definition "does not actually make graduate or advanced legal academic training an absolute prerequisite," but rather "[a]n employee who acquires the qualifications for the required level of work through other than the 'customary means' . . . may still be considered to be a professional employee . . . ." (*Ibid.*) PERB thus concluded nonattorney hearing officers "through training and on-the-job experience under supervision of professional employees, qualify for inclusion . . . ." (*Id.* at pp. 18–19.) PERB further noted "hearing officers generally are required to have active membership in the State Bar of California," which requires successful completion of an examination and a demonstration of moral fitness, and usually requires graduation from law school. (*Id.* at p. 19.) It also explained the professional skills exercised by hearing officers, such as conducting hearings, applying procedural and substantive rules of law, ruling on issues of evidence, and writing legal decisions, arose in part from their "professional legal training." (*Id.* at p. 20.)

Here, the University has not identified any advanced knowledge of a similar level to that outlined in *Unit Determination*. Nor has the University identified any tasks performed by systems administrators that are based on such advanced knowledge. Rather, the evidence in the record demonstrates systems administrators apply a similar type of knowledge as utilized by other job classifications in the TX unit. For example, the key responsibilities for systems administrators generally include (1) implementing network

17

communications, solutions, and system enhancements; (2) managing computer servers, operating systems, databases, utilities and Internet/intranet-related tools; (3) programming and related tasks; and (4) managing security for "campus information" and "routers and switches." The required skills and knowledge include an ability to clearly communicate technical information, an ability to assess system-related issues and "actions needed to improve or correct performance," an understanding of how technology and systems can meet business needs, and skills to adapt equipment and technology to meet user needs.

Similarly, the business technical support analyst classification "provid[es] day-to-day advanced consultation, training, instruction and troubleshooting/problem-solving to technical staff and end users for hardware, software, network and related computer systems," "[a]nalyzes, recommends, installs, configures and evaluates systems and tools for internal and end user use," "[d]evelops and conducts tests of hardware and software and reports on configurations and behavior," "[d]evelops and provides technical documentation and training," and "[a]ssesses needs and recommends hardware and software acquisitions and upgrades." The computer resource specialists "provide a wide range of technical and consultative services related to the acquisition, use, and maintenance of computer and/or network software and hardware and the development of computer applications," including "install[ing] and maintain[ing] hardware and software systems," "manipulat[ing] computer software," and analyzing "existing systems" and "problems to effect computer-oriented solutions." And the technology support analysts "provide technical support for all activities related to desktop computer systems and related peripherals." This technical support encompasses a range of duties as to "desktop systems, workstation,

18

service, network, and operating and other software and devices," including "participat[ing] in or manag[ing] development of IT and infrastructure projects."[6] The technology support analyst classification specifically notes its complexity by "the advanced nature of technical and analytical skills required, the size, nature and complexity of the information technology environment supported and by the planning and organizational activities in which incumbents are involved."

While the University argues PERB should have looked beyond the job qualifications to "the actual knowledge and experience possessed by incumbents," it fails to cite any evidence suggesting a disparity between the job descriptions and the employees' actual skill sets. "The burden of providing sufficient evidence demonstrating that a material issue of fact does exist lies with the party seeking to exclude certain employees from the bargaining unit . . . ." (*Children of Promise Preparatory Academy* (2013) PERB Order No. Ad-402, p. 17.)

In the absence of such conflicting evidence, PERB was not obligated to conduct a hearing. California Code of Regulations, title 8, section 32786,

---

[6] The full description for the technology support analyst classification is as follows: "Install, configure, upgrade and troubleshoot desktop systems, workstation, service, network, and operating and other software and devices and establish and maintain passwords, data integrity and file system security in a heterogeneous desktop environment; identify, modify, test and apply patches, upgrades and other software for automated distribution to the organization's computers, customize and configure software applications based upon user needs, monitor desktop usage, track user requests and incident reports and provide timely resolution of problems or escalate issue to the next tier of support as appropriate; recommend hardware and software solutions including new acquisitions and upgrades and replace and dispose of obsolete equipment. May provide assistance with administration of incident tracking software, conduct training programs to educate the organization's computer users about basic and specialized applications and participate in or manage development of IT and infrastructure projects."

subdivision (a) (PERB Regulation 32786) only requires a hearing "where appropriate." And PERB has repeatedly held a hearing is unnecessary where no material issue of disputed fact exists. (See, e.g., *Children of Promise Preparatory Academy*, *supra*, PERB Order No. Ad-402, p. 17 ["Although Board agents must conduct an investigation, that investigation may lead them to determine that sufficient evidence has been submitted to raise a material issue that necessitates an evidentiary hearing, or they may determine, as did the Board agent did in this case, that no material issue of fact exists and thus that a hearing is unnecessary."]; *Mount Diablo Unified School District* (2014) PERB Order No. Ad-405, p. 4 [same]; *St. HOPE Public Schools* (2018) PERB Order No. Ad-472, p. 15, fn. 12 [same].)

## 2. Community of Interest

The University next argues even if systems administrators do not fall within the statutory definition of "professional," they share a community of interest distinct from those in the TX unit.

Section 3579, subdivision (a) identifies various criteria for PERB to consider when assessing the appropriateness of a unit. These criteria include: "(1) The internal and occupational community of interest among the employees, including, but not limited to, the extent to which they perform functionally related services or work toward established common goals, the history of employee representation with the employer, the extent to which the employees belong to the same employee organization, the extent to which the employees have common skills, working conditions, job duties, or similar educational or training requirements, and the extent to which the employees have common supervision. [¶] (2) The effect that the projected unit will have on the meet and confer relationships, emphasizing the availability and authority of employer representatives to deal effectively with employee

20

organizations representing the unit, and taking into account factors such as work location, the numerical size of the unit, the relationship of the unit to organizational patterns of the higher education employer, and the effect on the existing classification structure or existing classification schematic of dividing a single class or single classification schematic among two or more units. [¶] (3) The effect of the proposed unit on efficient operations of the employer and the compatibility of the unit with the responsibility of the higher education employer and its employees to serve students and the public. [¶] (4) The number of employees and classifications in a proposed unit, and its effect on the operations of the employer, on the objectives of providing the employees the right to effective representation, and on the meet and confer relationship. [¶] (5) The impact on the meet and confer relationship created by fragmentation of employee groups or any proliferation of units among the employees of the employer." (§ 3579, subd. (a).)

Here, PERB's finding that a community of interest exists is supported by substantial evidence. The job descriptions reflect a similarity in "common skills" and "job duties" between systems administrators and employees in the TX unit. For example, the systems administrator job summary states the classification "[p]lans, designs, develops, implements and maintains systems and programs to insure the integrity, reliability and security of data and systems." Technology support analysts likewise are involved in "[i]nstall[ing], configure[ing], upgrad[ing] and troubleshoot[ing] . . . data integrity and file system security." The business technical support analyst classification involves "advanced consultation, training, instruction and troubleshooting/problem-solving" for "hardware, software, network and related computer systems."

The requisite knowledge and skills also overlap between systems administrators and other classifications in the TX unit.  For example, systems administrator III's utilize skills to adapt equipment and technology to meet user needs, and business technical support analyst III's provide strategic input to system redesign or development based on user needs. Similarly, systems administrator III's identify systems-related issues and how to improve performance, and business technical support analyst III's provide technical solutions to "a wide range of issues."  Likewise, systems administrator III's apply knowledge regarding systems to meet business needs, technology support analyst III's apply technical knowledge to resolve difficult and complex issues, and business technical support analyst III's analyze network problems and resolve issues that may have strategic impact.

The University's main argument against finding a community of interest is that systems administrators engage in "high-level analysis" similar to that performed by other unrepresented classifications, whereas employees in the TX unit work primarily with desktop computers and end-users.  However, the record suggests otherwise.  While computer resource specialists and technology support analysts do appear to work primarily with desktop computers and end-users, business technical support analysts analyze and evaluate "systems and tools" for internal use and end-users.

Moreover, the University fails to explain why working with desktop computers and end-users is at odds with "high-level analysis, design, and planning."  To the contrary, the job descriptions for TX unit classifications are replete with references to such work.  The job descriptions also indicate the complex nature of certain TX unit classifications.  For example, the technology support analyst "Series Concept" description specifically notes its complexity "by the advanced nature of technical and analytical skills

required, the size, nature and complexity of the information technology environment supported and by the planning and organizational activities in which incumbents are involved." Similarly, the business technical support analyst classification is categorized by the University as "professional," just like the systems administrator classification.

Certainly, the record indicates some differences between systems administrators and other TX unit classifications. The job descriptions indicate systems administrators primarily focus on data and security, while those functions play a smaller role in other classifications. A declaration submitted by the University asserts systems administrators work on a broader scale than TX unit employees—i.e., systems administrators manage the University's "enterprise computer systems and technologies," which "affect numerous users across the organization," whereas TX unit employees work on an individual's or a specific department's computer systems. However, " ' "[i]f there is a plausible basis for the Board's factual decisions, we are not concerned that contrary findings may seem to us equally reasonable, or even more so." ' " (*Boling*, *supra*, 5 Cal.5th at p. 912.) The record provides such a basis for PERB's conclusion that systems administrators have "common skills" and "job duties" with employees in the TX unit.

Moreover, other factors support PERB's community of interest finding. Systems administrators, for example, "perform functionally related services or work toward established common goals." (§ 3579, subd. (a)(1).) The University acknowledges systems administrators "design and maintain the computer systems used by employees in [the] TX classifications." Likewise, neither systems administrators nor other TX unit classifications require a bachelor's degree, and systems administrators have identical educational

23

requirements to business technical support analysts.  The record also indicates at least some systems administrators, albeit a minority, share common supervision with TX unit employees.

Section 3579 also instructs us to consider the impact of the unit modification on issues such as "meet and confer relationships," "efficient operations of the employer," the effect on "the objectives of providing the employees the right to effective representation," and "fragmentation of employee groups."  (§ 3579, subd. (a)(2)–(5).)  On the one hand, allowing the unit modification minimizes proliferation of units and avoids fragmentation of employee groups.  On the other hand, the record suggests the unit modification may undermine "the objectives of providing the employees the right to effective representation."  A prior attempt by UPTE to represent an "administrative professionals unit," which would have included the majority of employees performing the newly classified systems administrator work, was rejected.  The record also contains various letters from employees in the systems administrator classification stating they do not wish to be part of the TX unit or represented by UPTE.

As a whole, however, we cannot conclude PERB abused its discretion in determining systems administrators could appropriately be included in the TX unit.  (See *Regents of the University of California* (2015) PERB Dec. No. 2422-H, p.  6 ["No one criterion in the community of interest analysis is determinative.  The point in comparing these factors 'is to reveal the interests of employees and [to] ascertain whether they share substantial mutual interests in matters subject to meeting and negotiating.' "].)  Nor, as the University suggests, was UPTE required to create a new unit rather than seek to add employees to an existing unit.  We are unaware of any authority imposing such a requirement.  Rather, the unit modification petition must

satisfy the community of interest analysis, and PERB must only identify an appropriate unit, not the *most* appropriate unit. (§ 3573; *San Jose Unified School District* (1979) PERB Dec. No. 90, p. 13, fn. 16 ["a unit that is appropriate for meeting and negotiating need not be the most appropriate unit"]; *Santa Clara County Dist. Attorney Investigators Assn. v. County of Santa Clara* (1975) 51 Cal.App.3d 255, 260.)

## E. Proof of Majority Support

Having concluded substantial evidence supports PERB's placement of systems administrators in the TX unit, we turn to whether PERB erred in not requiring proof of majority support. The University contends PERB failed to count all employees performing the duties of systems administrators at the time of the Petition, which would have exceeded the 10 percent threshold. The University further contends PERB failed to exercise its discretion to require proof of majority support even if the Petition was below the 10 percent threshold.

Unit modification petitions are governed by PERB Regulation 32781. Subdivision (e)(1) provides, "If the petition requests the addition of classifications or positions to an established unit, and the proposed addition would increase the size of the established unit by ten percent or more, the Board shall require proof of majority support of persons employed in the classifications or positions to be added." (Cal. Code Regs., tit. 8, § 32781, subd. (e)(1).) We conclude PERB properly counted the number of systems administrators at the time the Petition was filed. We further find PERB's holding that it lacked discretion to require proof of majority support from UPTE was not clearly erroneous.

### 1. Number of Systems Administrators at the Time of the Petition

25

The parties do not dispute, at the time the Petition was filed, the number of employees in the systems administrator classification was less than 10 percent of the TX unit. By the University's own calculation, the TX unit included approximately 4,059 employees, and 325 employees were in the systems administrator classification. Also undisputed is the fact that the University was in the process of reclassifying employees, and certain additional employees would likely be reclassified as systems administrators. The University submitted a declaration stating that approximately 154 additional employees would likely be reclassified.

Nor does either party argue the number of systems administrators should be calculated *after* the filing date of the Petition. Rather, the parties disagree about whether PERB was required to consider employees performing the job duties of systems administrators but under a different classification. Specifically, the University argues PERB was required to look at job duties—rather than any particular job title—in assessing the number of employees impacted by the unit modification at the time UPTE filed the Petition. We disagree.

As an initial matter, the University's position is at odds with the statutory language. PERB Regulation 32781, subdivision (e)(1) specifically provides PERB "shall require proof of majority support of persons *employed in the classifications or positions to be added*." (Cal. Code Regs., tit. 8, § 32781, subd. (e)(1), italics added.) The regulation focuses on those individuals actively "employed in" specific classifications or positions. (*Id.*, subd. (e)(2).) The employees at issue here were employed in other classifications at the time of the Petition.

We also disagree PERB has an obligation to look at job duties when assessing the need for proof of majority support. To this end, we find *San*

26

*Francisco Housing Authority* (2015) PERB Order No. Ad-420-M instructive. There, a union appealed dismissal of its unit modification petition. (*Id.* at p. 1.) The union argued the employer had been hiring employees into a maintenance mechanics classification, which was represented by a different bargaining unit, to perform work traditionally performed by the union's unit members. (*Id.* at pp. 2–3.) That petition sought to transfer the maintenance mechanic work—but not necessarily the position—back to its bargaining unit. (*Id.* at p. 3.) The union argued its request was consistent with transferring classifications between bargaining units. (*Ibid.*)

PERB concluded, in relevant part, that a unit modification petition seeking to transfer "work" rather than positions or classifications was not appropriate. (*San Francisco Housing Authority*, *supra*, PERB Order No. Ad-420-M, pp. 4–5, 9.) In adopting the administrative determination, PERB emphasized "unit modification procedures concern the appropriate inclusion or exclusion of 'positions' or 'classifications' from a bargaining unit." (*Id.* at pp. 9, 12.)

While *San Francisco Housing Authority*, *supra*, PERB Order No. Ad-420-M, involved the Meyers-Milias-Brown Act (§ 3500 et seq.) rather than HEERA, the regulatory language is identical, and we see no reason for applying a different interpretation to PERB Regulation 32781. (See *Gund v. County of Trinity* (2018) 24 Cal.App.5th 185, 196, review granted Aug. 22, 2018, S249792 ["Under the general rules of statutory construction, we may consider judicial interpretation of similar words in other statutes dealing with analogous subject matter."].)

The employees at issue here were employed by the University as programmer analysts when the Petition was filed. The programmer analyst classification was "broad," and has since been divided in 22 different job

functions, of which the systems administrator classification is one part of one job function. Accordingly, this case does not present a situation in which all programmer analysts were performing the work of systems administrators, and the employees merely needed a job title change. Rather, the University is asking PERB to evaluate the work performed by over 1,500 programmer analysts and include those performing the work of systems administrators—which, by the University's own calculation would encompass approximately 8 to 9 percent of programmer analysts while the remaining 91 to 92 percent perform nonsystems administrator work. This directly contradicts *San Francisco Housing Authority*, *supra*, PERB Order No. Ad-420-M.

Limiting unit modification petitions to "classifications or positions" also furthers the goal, expressed in the legislative history of PERB Regulation 32781, of "eliminat[ing] ambiguity and add[ing] clarity regarding when majority proof of support is required." (Cal. Reg. Notice Register 2005, No. 51-Z, p. 1773.) If PERB were required to consider all work functions of all employees, unit modification petitions would face numerous delays and, potentially, require a hearing for every unit modification petition. For example, PERB would need to determine what other classifications perform job functions that may overlap with classifications in the established unit. It would then need to assess what job functions, on an employee-by-employee basis, those employees were actually performing. When considering employers with thousands of employees, such a process is unrealistic. While PERB's unit modification regulations do not mandate a decision by a specific date, "public policy favor[s] rapid and expedient resolution of representation matters." (*County of Fresno* (2016) PERB Order No. Ad-433-M, p. 7.) Even in this situation, in which the University was already in the middle of its reclassification, the University needed from December 2016—the date the

Petition was filed—until May 2017, to provide a preliminary identification of employees at one location and anticipated requiring three to five more months to provide preliminary identifications at the remaining locations. The University fails to address how unions could ever seek proof of majority support if they cannot know which employees may be part of the unit modification petition.

Accordingly, the proper focus is on what employees were in the job classifications at issue at the time the Petition was filed. As explained in *Children of Promise Preparatory Academy*, *supra*, PERB Order No. Ad-402, "Proof of support is determined by PERB when a petition is filed and an employer provides a list of employees that comprise the petitioned-for unit. When a dispute arises thereafter as to the composition of the bargaining unit, PERB conducts an investigation to determine unit appropriateness. During this investigative process, which may or may not require an evidentiary hearing, the identity of individual employees within the unit may change over time as employees leave employment and are replaced. However, the initial determination regarding sufficiency of support . . . is determinative on the issue of majority support within the petitioned-for unit." (*Id.* at pp. 14–15.) While *Children of Promise Preparatory Academy*, *supra*, PERB Order No. Ad-402, *Kings County Office of Education* (1990) PERB Dec. No. 801, and *Orcutt Union Elementary School District* (2011) PERB Dec. No. 2183 involved hiring and resignations that occurred after the petitions were filed, we conclude their holdings equally apply to employees in different job classifications at the time of the petition. (Accord, *San Francisco Housing Authority*, *supra*, PERB Order No. Ad-420-M, pp. 4–5, 9 [focus on "positions" and "classifications," not "work"].)

29

None of the cases cited by the University compel a different conclusion. For example, in *Regents of the University of California*, *supra*, PERB Dec. No. 2422-H, PERB assessed whether new classifications belonged in a certain bargaining unit based on the statutory "community of interest" criteria. (*Id.* at p. 9.) PERB's discussion of job duties occurred in the context of a community of interest analysis, and PERB assessed where individuals with certain job titles—not individuals performing certain job duties—should be placed. (*Id.* at pp. 13–14, 18–19.) The decision did not hold that PERB must look to job duties, rather than job titles, in assessing whether the 10 percent threshold is triggered. Likewise, *Hemet Unified School District* (1990) PERB Dec. No. 820 involved a unit modification petition to add "certain job positions" to a bargaining unit. (*Id.* at p. 1.) In determining whether a job classification should be placed in a certain bargaining unit, PERB noted it "look[s] at the actual nature of the work performed by the incumbents in the position . . . ." (*Id.* at p. 9, underscoring omitted.) This approach is in accord with the community of interest analysis, which includes "job duties" as a factor for consideration. (§ 3579, subd. (a)(1).) While *Hemet* recognized a job classification may be split into those who are included in a bargaining unit and those who are not based on differing job functions, nothing in the decision suggested PERB must consider whether employees outside the job classification should be included in the classification. (Accord, *Marin Community College Dist.* (1978) PERB Dec. No. 55, pp. 7–8, 18 [establishing three classified negotiating units and assessing job duties as part of community of interest analysis when assessing which classifications of employees should be placed into which units]; see also *Regents of the University of California*, *supra*, PERB Dec. No. 2422-H, p. 14 [in unit determination proceedings, PERB is "without authority" to dictate whether

or how to create new classifications, but merely assesses whether duties performed by that classification "warrant inclusion in the petitioned-for unit"].)

It is undisputed the number of systems administrators was less than 10 percent of the established bargaining unit at the time the Petition was filed. While a small subsection of the programmer analyst classification would eventually be reclassified as systems administrators, those employees had not been identified and that reclassification had not happened at the time of the Petition. Because unit modification petitions focus on "classifications" or "positions," and not "work," PERB did not err in concluding UPTE was not required to provide proof of majority support.

### 2. *Whether PERB Should Have Conducted an Evidentiary Hearing*

The University next contends PERB should have conducted an evidentiary hearing on how many employees were performing the job duties of systems administrators. PERB Regulation 32786 instructs PERB to "investigate" and "where appropriate, conduct a hearing . . . in order to decide the questions raised by the petition and to ensure full compliance with the provisions of the law." (Cal. Code Regs., tit. 8, § 32786, subd. (a).) But it is undisputed the University had not reclassified those outstanding employees—or even begun the reclassification process at four locations—at the time the Petition was filed. And it was these undisputed facts that resulted in those employees being excluded from the assessment of whether to require proof of majority support. As explained in part II.E.1., *ante*, PERB properly concluded it must evaluate the proof of majority support requirement based on the number of employees in a classification, rather than performing certain job duties, and it did so as of the date the Petition was filed. In the absence of conflicting evidence, PERB was not obligated to

31

conduct a hearing.  (Cal. Code Regs., tit. 8, § 32786; *Children of Promise Preparatory Academy*, *supra*, PERB Order No. Ad-402, p. 17.)

### 3. *Whether PERB Has Discretion to Require Proof of Majority Support If Proposed Unit Modification Is Less Than 10 Percent*

Finally, the University contends PERB erred in concluding it lacked discretion to require proof of majority support if the number of employees to be added was less than 10 percent of the existing unit.  We disagree.

PERB Regulation 32781, subdivision (e)(1) provides:  "If the petition requests the addition of classifications or positions to an established unit, and the proposed addition would increase the size of the established unit by ten percent or more, the Board shall require proof of majority support of persons employed in the classifications or positions to be added."  (Cal. Code Regs., tit. 8, § 32786, subd. (e)(1).)  PERB has interpreted this language as prohibiting it from requiring proof of majority support if the proposed addition is less than 10 percent of the established unit.  (*2010 Regents*, *supra*, PERB Dec. No. 2107-H, p. 21 ["PERB may not require proof of majority support when a unit modification petition seeks to add unrepresented positions that total less than 10 percent of the established unit"].)  While the University acknowledges the *2010 Regents* decision, it argues the matter was wrongly decided and inconsistent with HEERA and the National Labor Relations Act (NLRA; 29 U.S.C. § 151 et seq.).

"Generally, we apply the same rules governing interpretation of statutes to the interpretation of administrative regulations.  [Citation.]  ' "We give the regulatory language its plain, commonsense meaning.  If possible, we must accord meaning to every word and phrase in a regulation, and we must read regulations as a whole so that all of the parts are given effect.  [Citation.]  If the regulatory language is clear and unambiguous, our task is

32

at an end, and there is no need to resort to canons of construction and extrinsic aids to interpretation. [Citation.]" [Citation.] Our primary aim is to ascertain the intent of the administrative agency that issued the regulation. [Citation.] When that intent "cannot be discerned directly from the language of the regulation, we may look to a variety of extrinsic aids, including the purpose of the regulation, the legislative history, public policy, and the regulatory scheme of which the regulation is a part." ' " (*Berkeley Hills Watershed Coalition v. City of Berkeley* (2019) 31 Cal.App.5th 880, 890–891.)

The plain language of PERB Regulation 32781 sets forth when proof of majority support is required. It is silent as to whether proof of majority support may be required in other instances. Accordingly, we must turn to extrinsic aids to assist our interpretation.

The regulatory history provides useful guidance. Prior to imposing the 10 percent threshold for requiring majority support, former subdivision (f) of PERB Regulation 32781 stated, "If the petition requests the addition of classifications or positions to an established unit . . . , the Board *may require* proof of majority support of persons employed in the classifications or positions to be added." (Cal. Code Regs., tit. 8, § 32781, former subd. (f), Register 85, No. 41-A (Oct. 12, 1985) p. 2060.4, italics added.) PERB removed this "may require" language when revising this provision, and instead replaced it with language stating PERB "shall require proof of majority support" if the unit modification petition "would increase the size of the established unit by ten percent or more." (Cal. Code Regs., tit. 8, § 32781, subd. (e)(1).) "We presume the Legislature intends to change the meaning of a law when it alters the statutory language [citation], as for example when it deletes express provisions of the prior version [citation]. Because the

Legislature is presumed aware of prior judicial constructions of a statute, the inference of altered intent is particularly compelling when, as in this case, the omitted word or phrase was significant to such a construction." (*Dix v. Superior Court* (1991) 53 Cal.3d 442, 461–462.) Accordingly, PERB Regulation 32781's revision, which replaces the "may require" language with the "shall require" language, is key to its interpretation. PERB Regulation 32781 could easily have been revised to merely add the "shall require" provision to the preexisting "may require" language. The regulation thus could have stated PERB may require proof of majority support for unit modification petitions but shall require such proof when the proposed addition constitutes 10 percent or more of the established unit. But that did not occur. The decision to omit the "may require" language indicates a legislative intent to remove discretion from PERB to generally require proof of majority support.

PERB also interpreted this regulation in *2010 Regents*, *supra*, PERB Dec. No. 2107-H, a matter involving the same parties to the current dispute. In that case, PERB evaluated a unit modification petition seeking to add unrepresented case managers to a bargaining unit represented by UPTE. (*Id.* at pp. 1–2.) The University argued in part UPTE's petition should be denied because it was not accompanied by proof of majority support. (*Id.* at p. 19.) The University asserted PERB Regulation 32781, subdivision (e)(1) gave PERB discretion to require such proof. (*2010 Regents*, at p. 20.) PERB rejected this argument. (*Ibid.*) In reaching its conclusion, PERB explained prior iterations of PERB Regulation 32781 gave it discretion to require proof of majority support, and it had exercised such discretion when a petition sought to " 'add a substantial number of employees' " such that it " 'would constitute a substantial change in the structure of that unit.' " (*2010 Regents*,

34

at p. 20, citing *State of California, Department of Personnel Administration* (1989) PERB Dec. No. 776-S (*DPA*).)[7]  It further explained the amendment to PERB Regulation 32781's proof of majority support requirement was designed "to eliminate ambiguity and add clarity regarding when majority proof of support is required . . . .  Section 32781(e) . . . states that PERB 'may require such support, but the regulations do not provide criteria for when PERB 'should' require support.  Use of a standard whereby support was required if the positions to be added equal 10 percent or more of the number of employees in the established unit was approved in a Board decision ([*DPA, supra,*] PERB Decision No. 776-S) but never adopted as 'the standard' by the Board.  The proposed amendments to section 32781 . . . would incorporate the 10 percent standard and make it mandatory." (*2010 Regents*, at pp. 20–21, citing Cal. Reg. Notice Register 2005, No. 51-Z, p. 1773.)  While the revised PERB Regulation 32781, subdivision (e)(1) only stated when PERB "shall require" proof, PERB concluded the regulation contained no " 'residual' discretion." (*2010 Regents*, at p. 21.)  It held "increasing the unit by less than

---

[7] The University argues *DPA, supra*, PERB Dec. No. 776-S did not support the " 'ten percent rule' " adopted in the current version of PERB Regulation 32781 because it involved a potential unit increase of 22 percent.  While *DPA* does not discuss a " 'ten percent rule,' " it explained, "In situations where a unit modification petition seeks to add a substantial number of employees to an established bargaining unit, the Board has required proof of majority support as a matter of practice since adoption of the [then-]current unit modification regulations." (*DPA*, at p. 1, adopting order dismissing petition at p. 4.) And *DPA* determined its situation "constitutes precisely the type of situation envisioned by the Board in the language of Regulation 32781 . . . ." (*Id*. at p. 1, adopting order dismissing petition at p. 5.)  When PERB subsequently revised PERB Regulation 32781, it referenced *DPA*, thus indicating it considered 10 percent "a substantial number" that should require proof of majority support "as a matter of practice."  Nothing in the *DPA* decision undermines PERB Regulation 32781, subdivision (e)(1) or contradicts PERB's interpretation.

35

ten percent does not call into question the incumbent union's majority support. Therefore, PERB may not require proof of majority support when a unit modification petition seeks to add unrepresented positions that total less than ten percent of the established unit." (*Ibid.*) PERB affirmed that interpretation in *County of Riverside* (2011) PERB Dec. No. 2163-M, pages 3–4, *Orcutt Union Elementary School District*, *supra*, PERB Dec. No. 2183, page 3, and, most recently, in the present dispute.

PERB's interpretation of its own regulation is entitled to substantial deference. (*In re Cabrera* (2012) 55 Cal.4th 683, 690 [" 'As a general matter, courts will be deferential to government agency interpretations of their own regulations, particularly when the interpretation involves matters within the agency's expertise and does not plainly conflict with a statutory mandate.' "].) The University, however, argues such an interpretation is fundamentally at odds with HEERA. We disagree. HEERA delegated to PERB the task of establishing procedures for unit modification petitions. (§ 3563, subd. (e).) In delegating such authority, the Legislature knew how to impose proof of support requirements. (See, e.g., § 3573 [proof of majority support required for union to be recognized as exclusive representative]; § 3576 [proof of 30 percent support required for decertification petition].) However, the Legislature did not impose any such requirements when delegating authority to PERB in connection with unit modification petitions. The fact that the Legislature chose not to impose such a requirement evidences the Legislature's intent to defer to PERB's regulation of such petitions. (Cf. *San Diego County Employees Retirement Assn. v. County of San Diego* (2007) 151 Cal.App.4th 1163, 1176 ["Legislature knew how to impose restrictions on a county's use of the retroactive benefit, and by not including [such] a rule . . . , we infer this requirement was not intended"].)

36

Moreover, PERB's reasoning in *2010 Regents* takes into consideration the rights afforded employees under HEERA. Section 3565 provides employees with the right to join, or refuse to join, employee organizations. But this provision, as the University acknowledges, provides employees with the right to choose whether to be represented by an employee organization. It does not provide employees with the "right to choose the bargaining unit in which their classification or position is placed." (*2010 Regents*, *supra*, PERB Dec. No. 2107-H, p. 24.) Questions concerning representation only arise "when there is a legitimate doubt about whether the union has majority support in the bargaining unit." (*Id.* at p. 20, fn. 14.) And accreting a classification of employees that constitutes less than 10 percent of the total number of employees in the unit would be unlikely to impact the union's majority support in the overall bargaining unit.

To the extent unions may seek to take advantage of these provisions and accrete only small groups of employees, certain statutory safeguards are provided. For example, PERB Regulation 32786, subdivision (c) authorizes PERB to "request proof of support . . . among unrepresented employees to be added to a unit, if classifications found appropriate to be added to the unit do not include all classifications originally petitioned for." (Cal. Code Regs., tit. 8, § 32786, subd. (c).) This provision provides a statutory framework for avoiding piecemeal accretion and grants PERB discretion to seek proof of support if additional classifications are added to a unit modification petition. Similarly, if a union accretes numerous classifications of under 10 percent against the employees' interests, it may find itself subject to a decertification petition. Section 3576 provides: "A petition may be filed with the board . . . requesting it to investigate and decide the question of whether the employees wish to decertify an exclusive representative or to reconsider the

appropriateness of a unit." While these provisions may not be ideal and, in practice, be difficult to implement, they represent the current legislative balance between unit structure and employee choice. It is not our role to rewrite this legislative scheme. (*Fair v. Fountain Valley School Dist.* (1979) 90 Cal.App.3d 180, 187 ["The role of the courts is not to legislate or to rewrite the law, but to interpret what is before them."].)[8]

The University contends *J. R. Norton Co. v. Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1 (*J. R. Norton*), prohibits a "blanket rule" prohibiting PERB from exercising its discretion to require proof of majority support. In *J. R. Norton*, the California Supreme Court considered in part whether the Agricultural Labor Relations Board (ALRB) could impose a " 'make-whole' remedy" as a matter of course in cases in which an employer has refused to bargain in order to obtain judicial review. (*Id.* at pp. 8–9.) The ALRB argued it could do so, including for technical refusals to bargain, because employees suffered the same harm as for flagrant or willful refusals to bargain. (*Id.* at p. 28.) The employer, however, argued the ALRB lacked authority to impose such relief in a categorical fashion when the unfair labor practice arose solely as a result of a technical refusal to bargain. (*Id.* at p. 29.)

The California Supreme Court agreed a blanket rule was not appropriate. (*J. R. Norton*, *supra*, 26 Cal.3d at p. 29.) "Doing so 'eviscerates

---

[8] We further note employers, as well as unions, may engage in such conduct. In *2010 Regents*, *supra*, PERB Dec. No. 2107-H, for example, UPTE filed a petition to have case managers moved into certain bargaining units. While the petition was pending, the University reclassified certain case managers as administrative nurse III, a classification outside the bargaining unit at issue. (*Id.* at p. 16.) In response, UPTE had to file a second amended petition to include those reclassified employees. (*Ibid.*)

important ALRA[9] policy and fundamentally misconstrues the nature of and legislative purpose behind such relief.' ([*J. R. Norton,*] at p. 29.)  Although 'make-whole relief is appropriate when an employer refuses to bargain for the purpose of delaying the collective bargaining process,' [the Supreme Court] said the Board's blanket rule 'place[d] burdensome restraints on those who legitimately seek judicial resolution of close cases in which a potentially meritorious claim' regarding a union election could be made.  (*Id*. at pp. 31–32.)" (*Tri-Fanucchi Farms v. Agricultural Labor Relations Bd*. (2017) 3 Cal.5th 1161, 1169.)  The court concluded automatic imposition of make-whole relief could not be justified as supporting collective bargaining because a "central feature" of collective bargaining requires "employees' free choice in selecting their bargaining representative," and such relief would not guarantee the integrity of representation elections.  (*J. R. Norton*, at p. 35.)

Here, however, the University has not identified a "central feature" of collective bargaining that would be undermined by prohibiting proof of majority support for unit modification petitions involving classifications that amount to less than 10 percent of an established unit.  In amending the regulation, PERB determined 10 percent represented the appropriate balance between unit determination and employee choice.  The University does not cite any authority challenging the appropriateness of that balance.  For petitions involving less than 10 percent of the established unit, the University only complains about the potential for piecemeal accretion of employees.  But, as discussed above, the statutory scheme addresses such concerns by allowing parties to add classifications to a unit modification petition and by providing a decertification process.  Accordingly, the

---

9 Alatorre-Zenovich-Dunlap-Berman Agricultural Labor Relations Act of 1975 (Lab. Code, § 1140 et seq.).

University has not identified any potential conflict with a key feature of collective bargaining as was raised in *J. R. Norton*.

Finally, the University argues PERB's interpretation is inconsistent with the NLRA. The University argues the NLRA, which contains similar employee choice rights as set forth in HEERA, only allows unrepresented employees to be accreted into an existing unit when " 'the additional employees have little or no separate group identity . . . and . . . share an *overwhelming* community of interest with the preexisting unit . . . .' " The University argues PERB "should be as committed to protecting employee choice as the NLRB" and should require proof of majority support unless there is an overwhelming community of interest between the positions to be accreted and those in the bargaining unit.

The University cites no authority supporting application of NLRB precedent to issues of accretion, and we are not aware of any. Moreover, the University's approach ignores the different approaches taken by PERB and the NLRB. (See *County of Riverside*, *supra*, PERB Dec. No. 2163-M, p. 3 ["PERB does not follow the NLRB's approach to accretion."].) While both PERB and the NLRB are concerned with the balance between employee rights and unit stability, they employ different approaches to reach that balance. The Legislature, in enacting HEERA, imposed its own structure, both through PERB Regulation 32781 and section 3579. To the extent the NLRB imposes different criteria in its analysis, those criteria are not relevant for interpreting California law. (Accord *Regents of University of California v. Public Employment Relations Bd.* (1986) 41 Cal.3d 601, 612 [Legislature rejected NLRB precedent by adopting a different definition of " 'employees' " in HEERA.].)

PERB's conclusion that it lacked discretion to require proof of majority support is bolstered by the legislative history and does not violate either HEERA or the NLRA.  Accordingly, we cannot conclude PERB erred in reaching its conclusion.  (See *Boling, supra*, 5 Cal.5th at p. 912 [" 'We follow PERB's interpretation unless it is clearly erroneous.' "].)

## III.  DISPOSITION

The petition for writ of extraordinary relief is denied.

_____
Margulies, J.

We concur:


_____
Humes, P. J.


_____
Sanchez, J.

A157597
*Regents of University of California v. Public Employment Relations Board*

Counsel:

Sloan Sakai Yeung & Wong LLP, Timothy G. Yeung for Petitioner.

J. Felix DeLaTorre, Wendi L. Ross, Joseph W. Eckhart and Kimberly J. Procida for Respondent.

Leonard Carder, LLP, Arthur Liou and Andrew J. Ziaja for Real Party in Interest.